**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DEBORAH L. PERDUE,**

     **Plaintiff,**

**v.**                                                         **Case No.: 3:10-cv-1318**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

## <u>MEMORANDUM OPINION</u>

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 1). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 11 and 12). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 10 and 15).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   <u>Procedural History</u>

Plaintiff, Deborah Perdue (hereinafter "Claimant"), filed an application for DIB benefits on October 4, 2007, alleging a disability onset date of May 2, 1999[1] due to diabetes, arthritis, sciatica, obesity, pain, sleep apnea, and depression. (Tr. at 111–16). The application was denied by the Social Security Administration (hereinafter "SSA") on November 16, 2007. (Tr. at 50–54). Claimant requested reconsideration on December 11, 2007. (Tr. at 55). The SSA denied Claimant's request for reconsideration on January 24, 2008. (Tr. at 56). Thereafter, Claimant requested a hearing before an administrative law judge (hereinafter "ALJ"). (Tr. at 61). The Honorable Charlie Paul Andrus, ALJ, presided over Claimant's hearing on October 28, 2008. (Tr. at 19–447). The ALJ denied Claimant's application by decision dated February 25, 2009. (Tr. at 5–17). The ALJ's decision became the final decision of the Commissioner on September 18, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1–4). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 7, 8, 10, and 15). Consequently, the matter is ripe for resolution.

## II.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th

---

[1] Claimant mistakenly listed May 2, 1998 as the disability onset date in her Disability Report and noted this mistake in her brief. (Pl.'s Br. at 2 n. 1).

Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial

3

gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). That section provides as follows:

> c) *Rating the degree of functional limitation.*
>
> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the

amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).

Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In the present case, at the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity between May 2, 1999, the date of her alleged disability onset date, and December 31, 2003, the date on which she was last insured. (Tr. at 10, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: degenerative joint disease of the feet and back, anxiety, and depression. (Tr. at 10, Finding No. 3). The ALJ further concluded that Claimant's diabetes, hypertension, carpal tunnel syndrome, and obesity were not severe impairments. (Tr. at 10–11, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments detailed in the Listing. (Tr. at 11, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding:

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could occasionally climb, balance, stoop, kneel, crouch, or crawl; could not work in cold temperature extremes or around excessive dust, fumes, or chemicals; could not reach overhead; could stand 2-3 hours total per day at 1 hour intervals, sitting was unaffected; and was limited to more simple, routine work without significant public contact.

(Tr. at 13, Finding No. 5).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 15–17, Finding Nos. 6–11). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) she was born in May 1958, and at age 45, was defined as a younger individual age 18–49 on the date the application was filed (20 CFR 404.1563); (3) she had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because, under the Medical-Vocational Rules, the evidence supported a finding that Claimant was "not disabled" regardless of whether she had transferable job skills. (*Id.*). Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as an assembler, grader sorter, and hand packer. (Tr. at 16, Finding No. 10). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 17, Finding No. 11).

### III.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined

"substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## IV.    **Claimant's Background**

Claimant was 40 years old at the time of her alleged disability onset, 49 years old when she filed her application for benefits, and 50 years old at the time of her administrative hearing. Claimant had previous experience working as an adult care giver, a child care giver at a day care center, a concession seller, a clerk in a department store, a housekeeper at a hospital, and briefly as a security guard. (Tr. at 129). Claimant had a high school education and was proficient in English. (Tr. at

8

16).

## V.    **Relevant Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute. The record includes medical evidence that pre-dates Claimant's alleged disability onset date of May 2, 1999 and medical evidence that post-dates Claimant's date of last insurance, December 31, 2003. The Court considered this evidence to the extent that it provides a more accurate understanding of Claimant's medical background.

### A.    **Treatment Records**

### 1.    **Prior to Disability Onset Date**

Chronologically, the oldest record in evidence is dated May 16, 1991 and details Claimant's evaluation by Dr. Earl Foster, at Scott Orthopedic, for complaints of pain and nocturnal paresthesia in both wrists.[2] (Tr. at 215–16). Claimant reported wearing wrist splints for the past three or four months without relief. (*Id.*). Dr. Foster noted that Claimant's numbness was localized in the median nerve. (Tr. at 215). Based on electrical studies of Claimant's median nerve and x-rays of Claimant's hands, Dr. Foster concluded that Claimant suffered from bilateral carpal tunnel syndrome. (*Id.*). Accordingly, he performed bilateral carpal tunnel release surgery on Claimant on May 28, 1991. (Tr. at 207–09). On June 3, 1991, Dr. Foster examined Claimant and found that her wrist motion was "fair," but that she

---

[2] Paresthesia is a sensation of numbness, burning, tingling, or pricking in the extremity. *See* National Institute of Neurological Disorders and Stroke at www.ninds.nih.gov.

continued to experience paresthesia at night. (Tr. at 210). On July 15, 1991, Dr. Foster issued a return to work letter, stating that Claimant could return to work on July 16, 1991. (Tr. at 201). Dr. Foster noted that Claimant's paresthesia was resolved and that she was doing "very well." (Tr. at 202).

On January 10, 1995, Claimant was admitted to River Park Hospital with complaints of severe depression and anxiety. (Tr. at 190–92). Claimant complained of insomnia; she reported going as long as three days without being able to sleep. (Tr. at 190). Further, Claimant stated that she had crying spells, a decreased appetite, and general lethargy. (*Id.*). Claimant's intake was completed by Dr. Timothy Saxe, who recorded Claimant's history of stomach and bowel problems, including diarrhea, constipation, stomach cramps, and stomach pain. (*Id.*). Claimant reported taking Glucotrol, Humulin NPH insulin, Zoloft, and Ativan. (*Id.*). She described experiencing anxiety attacks accompanied by chest pains, palpitations, shortness of breath, and difficulty swallowing. (*Id.*). At the time of her examination, Claimant was 5'2" and weighed 210 pounds. (Tr. at 192). Based on Claimant's history and physical examination, Dr. Saxe opined that Claimant suffered from major depression with anxiety, insulin dependent diabetes mellitus, possible irritable bowel syndrome, and gastroesophageal reflux. (*Id.*). She was admitted for treatment of her psychological symptoms. At discharge two weeks later, Claimant's attending psychiatrist, Dr. David Humphreys, summarized Claimant's treatment course, noting that numerous laboratory tests, including electrocardiograms, x-rays, and blood tests were all within normal limits. (Tr. at 186). Dr. Humphreys' final diagnoses were identical to those of Dr. Saxe. (Tr. at 187–89).

In April 1997, Claimant began treatment with Michael J. Fredrick, a local chiropractor, for back and knee pain. (Tr. at 438). Claimant reported that her knee pain began in February 1997 and that her back pain started on April 27, 1997. (Tr. at 452). Between April 29, 1997 and November 5, 1997, Claimant saw Dr. Fredrick twenty-one times.  On each visit, she complained of lower back, neck, and knee pain. (Tr. at 431–38, 452, 455). Despite her ongoing complaints, Claimant worked throughout this six month period, often attributing her back pain to lifting objects at work. (Tr. at 435).

The record indicates that Claimant resumed treatment with Dr. Fredrick on February 4, 1998. (Tr. at 430). Over the next six months, Claimant underwent treatment for back pain and foot pain on twenty-one separate occasions until August 21, 1998. (Tr. at 425–30). Her pain became increasingly centralized to her lower back and heels. On August 21, 1998, Claimant reported to Dr. Fredrick that her right shoulder was also causing her severe pain. (Tr. at 421). Claimant reiterated this complaint to Dr. Fredrick at her next appointment on September 8, 1998, stating that she was unable to raise her right arm due to the pain in her shoulder. (*Id.*). On September 9, 1998, Claimant indicated she had not slept due to the pain in her right shoulder and she reported experiencing a tingling sensation in her fingers. (*Id.*).  The following day, she advised Dr. Frederick that she had gone to the hospital for shoulder pain and had been prescribed Lortab and was told to consult with a neurosurgeon regarding possible surgical options for her right shoulder. (*Id.*).

On September 14, 1998, Claimant presented to the Emergency Room at St. Mary's Medical Center ("St. Mary's") with arm pain that she felt might be related to a cervical disk. (Tr. at 250). X-rays revealed no fracture, dislocation, or significant

11

degenerative changes in Claimant's right shoulder or right humerus. (Tr. at 249). Claimant was diagnosed with a rotator cuff injury and discharged with her arm placed in a sling. (Tr. at 250–51). She was instructed to consult with an orthopedic surgeon and a neurosurgeon. (Tr. at 251).

On September 17, 1998, Claimant consulted with Dr. Luis Bolano, an orthopedic surgeon, for her right shoulder pain. (Tr. at 197–98). Claimant did not recall any specific injury to her shoulder, but stated that the strength in her shoulder began to deteriorate significantly in early September 1998. (Tr. at 197). Claimant informed Dr. Bolano of her previous treatment by Dr. Fredrick and at St. Mary's, indicating that she was prescribed Robaxin, Lortab, and ibuprofen, but that these did not relieve her pain. (*Id.*). Dr. Bolano observed that Claimant had significant rotator cuff weakness with external rotation strength of only -3/5. (*Id.*). X-rays revealed no bone or soft tissue abnormalities. (Tr. at 198). Dr. Bolano concluded that Claimant had signs of a rotator cuff tear, although he felt that it was "somewhat unusual" for a tear to have occurred so acutely. Therefore, Dr. Bolano hypothesized that Claimant might be suffering from a pseudo paralysis of the rotator cuff due to a severe impingement type syndrome. (*Id.*). He scheduled an arthrogram for Claimant and recommended passive rehabilitative therapy with generalized rest of the shoulder. (*Id.*). Finally, Dr. Bolano stated that he did not believe that Claimant's shoulder pain was neurological in origin because her upper extremity exam, other than the shoulder, was essentially normal. (*Id.*).

On September 25, 1998, an arthrogram of Claimant's right shoulder was performed and revealed no abnormalities or arthographic evidence of a rotator cuff tendon tear. (Tr. at 196). Following the arthogram, Claimant returned to Dr. Bolano

on October 8, 1998. (Tr. at 194). Dr. Bolano noted that the arthrogram did not show a rotator cuff tear, but that Claimant continued to exhibit significant rotator cuff weakness and pain. (Tr. at 194). He suggested injections to relieve the discomfort, but Claimant refused them due her concern that they would negatively affect her blood sugar levels. (*Id.*). As an alternative, Dr. Bolano recommended supervised physical therapy. (*Id.*).

### 2.    Relevant Time Period

On August 27, 1999, Claimant resumed treatment with Dr. Fredrick. (Tr. at 421). Over the next twelve months, Claimant received treatment from Dr. Fredrick on sixteen separate occasions. (Tr. at 420–21). Although the severity of Claimant's pain varied over the twelve-month course of treatment, she consistently complained of shoulder, hip, and foot pain. (*Id.*). On September 24, 2000, Claimant presented to the Emergency Department at Cabell Huntington Hospital, complaining of lower back pain. (Tr. at 221–23). Claimant stated that the pain radiated into her chest and that she felt a pulse in her back. (Tr. at 221). A x-ray of Claimant's lumbar spine revealed no bone or joint abnormalities in Claimant's lumbosacral vertebrae. (Tr. at 229). The attending physician informed Claimant that she was likely suffering from a muscle strain. (Tr. at 223). Claimant was discharged and instructed to apply heat to her back, sleep on a firm mattress, avoid prolonged sitting, and take the prescribed pain medication, Darvocet. (*Id.*).

On October 27, 2000, Claimant consulted with Dr. David Weinsweig, a neurosurgeon, for persistent lower back problems. (Tr. at 234–35). Dr. Weinsweig noted that Claimant's lower back pain was her main complaint and she described the pain as radiating down her right leg posterolaterally to the ankle. (Tr. at 234).

She indicated that sitting and lying down did not bother her, but that walking exacerbated her pain. (*Id.*). Claimant stated that she had tried physical therapy, chiropractic care, and pain medication, but nothing seemed to help alleviate her symptoms. (*Id.*). A physical examination revealed that Claimant's motor strength was strong throughout her upper and lower extremities. (*Id.*). In addition, her sensation, reflexes, and gait were all normal. (*Id.*). Dr. Weinsweig concluded that Claimant suffered from lower back pain, possibly radicular in nature. Noting that x-rays of Claimant's lumbar spine were normal, Dr. Weinsweig ordered an MRI of the cervical and lumbar spine and recommended that Claimant seek treatment at a pain clinic. (*Id.*). The MRI was performed on November 6, 2000 and showed signs of degenerative disease. (Tr. at 231). The radiologist documented that Claimant's vertebral body alignment appeared within normal limits, but that there were multiple disc protrusions, canal stenoses, and disc herniations at C4, C5, C6, and C7. (*Id.*). With respect to Claimant's lumbar spine, the radiologist found that the vertebral body alignment appeared normal and there was no evidence of disc herniation or spinal stenoses, although some mild disc desiccation was present at the L3-L4 and L5-S1 levels. (*Id.*). On November 10, 2000, after reviewing Claimant's MRI results, Dr. Weinsweig diagnosed Claimant with small disc protrusions at the C4-C5, C5-C6, and C6-C7 levels. (Tr. at 232–33). Dr. Weinsweig concluded that this was evidence of multi-level cervical disc disease, but noted that none of the protrusions were particularly severe. (Tr. at 232). With respect to Claimant's lumbar spine, Dr. Weinsweig observed no abnormalities. (*Id.*). Dr. Weinsweig opined that the findings did not justify surgical intervention and recommended that Claimant seek treatment at the Cabell Huntington Hospital Pain Management Center. (*Id.*).

14

In conclusion, Dr. Weinsweig stated that Claimant's pain was "a difficult problem. She really needs to lose weight. Obviously, this is not the only solution to her problems, but should help. She says she knows this." (*Id.*).

On November 14, 2000, Claimant resumed treatment with Dr. Fredrick, still complaining of lower back and neck pain. (Tr. at 419–20). In November 2000, Claimant received treatment from Dr. Fredrick three times. (*Id.*). On July 14, 2001, Claimant was admitted to the Emergency Department at Cabell Huntington Hospital with complaints of severe back and rib pain. (Tr. at 406–08). X-rays of Claimant's right ribs revealed well-mineralized osseous structures with no evidence of an acute displaced fracture. (Tr. at 409). On November 23, 2001, Claimant was again treated by Dr. Fredrick for complaints of continuing mid to lower back pain. (Tr. at 419).

In early 2002, Claimant began to experience intermittent chest pain and Claimant was admitted to St. Mary's on February 6, 2002. (Tr. at 258–59). Claimant reported experiencing sharp pain in her chest that radiated outward into her back and neck. (Tr. at 258). Claimant also complained of nausea, but had no symptoms of vomiting or diaphoresis. The attending physician gave Claimant nitroglycerin, which alleviated her pain. (*Id.*).  An x-ray of Claimant's chest revealed that her heart, lungs, and mediasternum were all within normal limits with no evidence of acute disease within her chest. (Tr. at 245–46).

On February 7, 2002, Claimant was examined by Dr. George Linsenmyer, III, a cardiologist practicing at St. Mary's. (Tr. at 255–57). Dr. Linsenmyer recorded that Claimant had been experiencing chest pain intermittently over the past six months, which began in the mid-substernal area and radiated outwards to her back. The

pain, which felt like someone was sitting on her chest and was often accompanied by extreme shortness of breath, typically occurred with physical activity, after eating, or sometimes while resting. (Tr. at 255).   Dr. Linsenmyer described Claimant's symptoms as "very worrisome" and informed Claimant of her medical treatment options, including cardiac catheterization. (Tr. at 256). Claimant expressed her desire to proceed with the cardiac catheterization procedure. (Tr. at 257). Later that day, Claimant was also examined by Dr. Ron Brownfield, a family medicine specialist, for preoperative clearance. (Tr. at 252–54). Dr. Brownfield's account of Claimant's symptoms was similar to that of Dr. Linsenmyer. In addition to Dr. Linsenmyer's concerns, Dr. Brownfield expressed concern that Claimant might be suffering from angina. (Tr. at 253). Further, Dr. Brownfield noted that Claimant was morbidly obese, reported difficulty controlling her diabetes, had a strong family history of arteriosclerotic vessel disease, and continued to experience symptoms of gastroesophageal reflux disease. (Tr. at 254).   Dr. Brownfield cleared Claimant for catheterization.

On February 19, 2002, Claimant returned to St. Mary's for a post catheterization follow-up appointment with Dr. Brownfield. (Tr. at 315–16). Dr. Brownfield noted that the results of Claimant's heart catheterization were "totally normal." (Tr. at 315). In his assessment, Dr. Brownfield concluded that Claimant probably had chronic cholecystitis in addition to her Type II diabetes, back pain, and insomnia. (Tr. at 316). Accordingly, he ordered an ultrasound, which ultimately revealed no abnormalities in Claimant's liver, gallbladder, bile ducts, or right kidney. (Tr. at 319). On April 5, 2002, Claimant reported to Dr. Brownfield that she was still experiencing chest pain. (Tr. at 314). She requested a prescription for

16

another medicine as the Vioxx and Celebrex were not helping. (*Id.*).

On June 3, 2002, Claimant resumed treatment with Dr. Fredrick for her lower back pain. (Tr. at 418). A radiographic report revealed simple scoliosis of the cervical spine and subluxations of the C7, T5, T10, and L5 discs. (Tr. at 442). At Dr. Fredrick's request, Claimant rated her pain on a scale of one to ten: lower back, 8/10; neck, 5/10; and right heel and right leg, 10/10. (Tr. at 448–49). Claimant reported taking a variety of medications for different medical conditions, including: Bextra for arthritis, Prevacid for reflux, Zestril for blood pressure, and Tranxene for anxiety. (*Id.*). Claimant stated that Bextra helped reduce her pain symptoms during the day, but that she needed a higher dosage to last her through the evening. (Tr. at 313). On August 11, 2003, Dr. Fredrick completed a radiographic examination of Claimant's back. (Tr. at 441). Based on the films, Dr. Fredrick opined that Claimant had hypolordosis and scoliosis of the cervical spine and misalignment and hyporlordosis of the lumbar spine. (*Id.*).

On August 20, 2003, Claimant was examined by Dr. Brownfield. (Tr. at 305–06). Claimant wore orthotics and Rockport shoes to her appointment because "her feet [were] killing her." (Tr. at 305).  She reported seeing a podiatrist, who suggested heel surgery.  Claimant also complained of a knot under her right rib with chronic right-sided rib pain that was exacerbated by moving and coughing. (*Id.*). Dr. Brownfield concluded that Claimant was suffering from proctitis, costochondritis, severe plantar fasciitis, and Type II diabetes. (*Id.*). For therapeutic purposes, Dr. Brownfield recommended support shoes and a plastic heel cup and instructed Claimant to continue taking Bextra. (Tr. at 306). He advised Claimant to follow his recommendations for at least a few weeks before seriously considering heel surgery.

On September 10, 2003, Claimant was examined at Browning Eye Center for complaints of difficulty focusing and episodes of light blindness when driving at night. (Tr. at 345).  Because these problems can be related to diabetes, a diabetic eye examination was performed. The examination revealed no abnormalities in Claimant's eyesight and a best corrected visual acuity of 20/20. (Tr. at 346).

### 3.    Post Date Last Insured

On July 19, 2004, Claimant reinitiated treatment with Dr. Fredrick for her lower back, hip, leg, and foot pain. (Tr. at 414). In addition, on October 18, 2004, Claimant underwent a colonoscopy performed by Douglas Henson, MD, at Cabell Huntington Hospital. (Tr. at 394). The results of the colonoscopy were normal. (*Id.*).

On July 3, 2005, Claimant was admitted to the Emergency Department at Cabell Huntington Hospital with complaints of arm and elbow pain resulting from a fall. (Tr. 383–389). Claimant also complained that she had noticed blood in her urine following the fall. (*Id.*). An x-ray of Claimant's right elbow, humerus, shoulder, and forearm showed no evidence of bone or joint abnormality. (Tr. at 390). On December 24, 2006, Claimant was admitted to the emergency room at Cabell Huntington Hospital for complaints of right flank pain and an injury to her right leg and ankle from falling off a chair. (Tr. at 372–81). Several days later on December 29, 2006, Claimant returned to the Emergency Department at Cabell Huntington Hospital complaining of radicular pain down her right flank. (Tr. at 362–70). Claimant stated that she was experiencing severe pain and have been vomiting and unable to take her medicine for several days. (*Id.*). The attending physician concluded that Claimant was suffering from kidney stones. (*Id.*).

On January 3, 2007, Claimant was examined by Dr. Brownfield following her visit to the hospital. (Tr. at 347–50). Dr. Brownfield documented that Claimant had been suffering from kidney stones and was complaining of persistent abdominal and back pain that had been occurring for two to three weeks. (Tr. at 347).  Claimant also stated that she experienced chest pain frequently. (Tr. at 348). According to Claimant, the chest pain occurred throughout the day and at night. (*Id.*). Claimant noted that her chest pain was exacerbated by exertion and had been present intermittently for the past several years. (*Id.*). Dr. Brownfield cleared Claimant to undergo surgery by Dr. Molina for treatment of the kidney stones. (Tr. at 350).

On April 14, 2007, Claimant resumed treatment with Dr. Fredrick. (Tr. at 445). Claimant reported lower back pain that radiated down into her right leg. (*Id.*). Claimant also reported neck pain, knee pain, and that she was suffering from kidney stones. (Tr. at 413). On April 19, 2007, Dr. Fredrick completed a radiographic examination of Claimant's back pain that revealed severe hyporlordosis of the cervical spine, subluxation of the thoracic spine, and hyporlordosis of the lumbar spine. (Tr. at 439). Dr. Fredrick noted that Claimant's leg was injured in December 2006 and she had sprained ligaments from that injury. (Tr. at 446). Between April and November of 2007, Claimant received treatment from Dr. Fredrick on thirteen different occasions. (Tr. at 410–13, 461–62). Claimant's back and leg pain varied over this period of time but her description of back and leg pain was consistent. (*Id.*).

On May 16, 2008, Claimant was admitted to St. Mary's with complaints of dyspnea, wheezing, heart palpitations, and breathlessness at night. (Tr. at 516–18). She was seen in consultation by Dr. Terrance Ross, a cardiac electrophysiologist.

Dr. Ross perceived an atrial flutter and evaluated Claimant to determine whether she was an appropriate candidate for cardiac ablation. (Tr. at 518). Claimant was also examined by Dr. Christine Gilkerson, a cardiologist. (Tr. at 540–43). Claimant reported to Dr. Gilkerson that she had been experiencing extreme shortness of breath and that her dyspnea and fatigue had worsened in the previous three weeks. (Tr. at 540). Dr. Gilkerson noted that Claimant had atrial fibrillation and experienced serious chest pressure and muscles spasms. (*Id.*). Dr. Gilkerson found that Claimant was suffering from new-onset atrial fibrillation and had significant risk factors that would contribute to the early development of coronary artery disease. (Tr. at 542). A x-ray of Claimant's chest revealed no acute or active pulmonary disease and a mildly enlarged heart. (Tr. at 546). On May 17, 2008, Claimant was examined by Dr. Ellen Thompson. (Tr. at 530–34). Dr. Thompson's patient history for Claimant was similar to those of Dr. Ross and Dr. Gilkerson. (Tr. at 530). Based on this patient history, Dr. Thompson recommended an ischemic evaluation, including a left heart catheterization and an echocardiogram. (Tr. at 533). The May 19, 2008 echocardiogram report revealed no abnormalities. (Tr. at 528–29). On May 20, 2008, Claimant underwent a stress test conducted by Dr. Gilkerson. (Tr. at 523–24). Dr. Gilkerson noted that Claimant's heart maintained a regular rate and rhythm without a significant hypertensive response. (Tr. at 523). Claimant did experience symptoms of nausea and chest fullness, which resolved "fairly immediately" after the conclusion of the test. (*Id.*). Dr. Gilkerson did find a continued atrial flutter in Claimant's heart throughout the stress test. (*Id.*).

On May 23, 2008, Dr. Gilkerson inserted a central venous catheter into Claimant's heart. (Tr. at 519–21). Dr. Gilkerson discharged Claimant and concluded

that Claimant suffered from: atrial fibrillation, atrial flutter, hypertension, diabetes, obstructive sleep apnea, esophageal reflux disease, hyperlipidemia, and obesity. (Tr. at 535–37). Several days after discharge, Claimant was examined by a family physician, Dr. Gary D. Cremeans, in a follow-up appointment. (Tr. at 550). Claimant reported having swelling in her feet and headaches. (*Id.*). Dr. Cremeans noted Claimant's history of hypertension and stated that he believed she would likely need to go back on an ace inhibitor to alleviate her hypertension. (*Id.*). On July 17, 2008, Claimant was seen again by Dr. Cremeans. (Tr. at 548). Claimant complained of swelling in her hands and feet, persistent chest pain, depression, and anxiety. (*Id.*). She stated that her arthritis had been causing her significant pain for several weeks. (*Id.*). Dr. Cremeans prescribed Zoloft to help mitigate Claimant's depression and anxiety. (*Id.*).

### B.   **Agency Assessments**

### 1.   **Physical Health Assessments**

On November 14, 2007, Kathy Westfall, a single decision maker, completed a Physical Residual Functional Capacity Assessment (RFC)-Physical. (Tr. at 463–70). Ms. Westfall made no RFC findings, noting that Claimant had submitted insufficient evidence to the SSA upon which to assess her functional abilities. (Tr. at 470). Ms. Westfall further noted that the record contained an eye exam from December 12, 2003 and an EKG from September 24, 2000. (*Id.*). The EKG was unremarkable. (*Id.*). The only other evidence included complaints of lower back pain and that Claimant walked with a mild limp. (*Id.*).

On January 23, 2008, James Egnor, MD, completed a RFC-Physical at the request of the SSA. (Tr. at 502–09). He found that Claimant could occasionally lift

50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in her ability to push or pull. (Tr. at 503). Dr. Egnor identified numerous postural limitations. Based on Claimant's chronic pain and morbid obesity, Dr. Egnor concluded that Claimant could only occasionally engage in work activities that required: climbing ramps, stairs, ladders, ropes or scaffolds; balancing; stooping; kneeling; crouching; or crawling. (Tr. at 504). He identified no manipulative, visual, or communicative limitations, but determined that Claimant was subject to several environmental limitations. (Tr. at 505–06). Dr. Egnor concluded that Claimant should avoid concentrated exposure to extreme cold and hazards, such as machinery and heights. (Tr. at 506). After reviewing the medical record, Dr. Egnor found that Claimant was morbidly obese and suffered from chronic athralgia without a decline in neurological or motor skill functions. (Tr. at 509). Dr. Egnor made no credibility finding and reduced Claimant's RFC to "limited" due to Claimant's morbid obesity and other medical issues. (*Id.*).

### 2. Mental Health Assessments

On November 15, 2007, Jim Capage, Ph.D, completed a Psychiatric Review Technique (PRT) at the request of the SSA. (Tr. at 472–85). Dr. Capage did not provide a medical disposition due to a lack of sufficient evidence. (Tr. at 472). Dr. Capage noted that there were no records prior to December 31, 2003, the date on which Claimant was last insured. (Tr. at 484). On January 21, 2008, Debra Lilly, Ph.D, completed a PRT at the request of the SSA. (Tr. at 488–501). Dr. Lilly noted that evidence prior to the disability onset date of May 2, 1998 showed that Claimant suffered from major depression, chronic pain, irritable bowel syndrome, and gastroesophageal reflux. (Tr. at 500). However, no evidence for the time period

between the alleged onset date and the date of last insurance was presented to Dr. Lilly. (*Id.*). Therefore, Dr. Lilly was unable to issue a medical disposition due to lack of sufficient medical evidence. (*Id.*).

## VI.   **Claimant's Challenges to the Commissioner's Decision**

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ erred in finding that Claimant's diabetes and obesity were not severe impairments and did not significantly limit her ability to perform basic work-related functions; (2) the ALJ failed to take into account Claimant's diabetes and obesity in assessing Claimant's RFC; (3) the ALJ failed to consider the records of Claimant's extensive chiropractic treatment with Dr. Fredrick; and (4) the ALJ improperly evaluated Claimant's credibility. (Pl.'s Br. at 7–10).

## VII.   **Analysis**

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions as lacking merit. Additionally, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A.   **The ALJ's Severity Finding**

Claimant first challenges the ALJ's finding that Claimant's diabetes and obesity were not severe impairments and did not significantly limit her ability to engage in basic work activities. Pointing to her treatment by numerous physicians, Claimant contends that the objective medical evidence supports the conclusion that her obesity and diabetes significantly affected her ability to engage in work-related functions.

> Social Security Regulations provide the basic definition of disability as:
>
> the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work (*see* § 404.1560(b)) or any other substantial gainful work that exists in the national economy.

20 C.F.R. § 404.1505(a). Under the five-step sequential evaluation process for the adjudication of disability claims, if the claimant is not currently engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* at § 404.1520(c). A "severe" impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to do basic work activities. *Id.* at § 404.1521(a). "Basic work activities"[3] refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p (citing SSR 85-28); *see also Albright v. Commissioner of Social Sec. Admin.*, 174 F.3d 473, 478 n. 1 (4th Cir. 1999) (*citing Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984)). "A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and

_____

[3] Examples of "basic work activities" are (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p (citing SSR 96-7p).

Here, the ALJ reviewed the record and correctly found that Claimant's diabetes and obesity did not significantly limit Claimant's ability to engage in basic work activities. After finding that Claimant's degenerative joint disease, anxiety, and depression were severe impairments, the ALJ evaluated the evidence pertaining to Claimant's diabetes. The ALJ acknowledged Claimant's diagnosis and treatment for diabetes, but noted that according to the medical records, her diabetes was controlled by medication. (*Id.*). The ALJ also considered the effect of Claimant's obesity on her ability to perform basic work activities. (*Id.*). He confirmed that during the relevant time period, Claimant was five feet two inches tall and weighed approximately 265 pounds. (*Id.*). The ALJ recognized that multiple physicians had diagnosed Claimant as suffering from obesity, but found nothing in these records to suggest that Claimant's obesity significantly limited her ability to engage in basic work activities.

The ALJ's finding that Claimant's diabetes and obesity were not severe impairments and did not significantly limit her physical or mental ability to perform basic work activities is supported by substantial evidence. During the relevant time frame, no treating physician found that Claimant's diabetes significantly inhibited her capacity to complete her daily tasks. Similarly, no physician placed any functional restrictions or limitations on Claimant's work activities, although during this period, Claimant was operating a day care center in her home. As the ALJ noted, Claimant's diabetes was diagnosed on January 10, 1995, prior to her disability onset date. (Tr. at 192). She was placed on medication to control her blood

sugar and appeared to manage well. On February 7, 2002, Claimant was examined by Dr. Brownfield after presenting to St. Mary's with chest pain. (Tr. at 252–54). During this consultation, Claimant stated that she was having difficulty controlling her diabetes. (Tr. at 254). However, on February 19, 2002, Dr. Brownfield reviewed Claimant's glucose diary and opined that her diabetes was "under fairly good control." (Tr. at 316). Claimant did not display signs and symptoms consistent with the complications of diabetes and her glucose regimen required no modifications. She received a visual examination on September 10, 2003 that was specifically targeted to uncover evidence of abnormalities related to diabetes. (Tr. at 346). The examining ophthalmologist noted no worrisome findings and determined that Claimant's best corrected visual acuity was 20/20. (*Id.*). Consequently, the available records contradict a finding that Claimant's diabetes was a severe impairment.

Similarly, during the relevant time period, no treating physician documented limitations or recommended restrictions on Claimant's activities as a consequence of her obesity. On October 27, 2000, Dr. Weinsweig conducted a physical examination of Claimant, which revealed that Claimant's motor strength was strong throughout her upper and lower extremities and that Claimant's sensation, reflexes, and gait were all normal. (Tr. at 234–35). On November 10, 2000, following an MRI, Dr. Weinsweig stated that Claimant's back pain was "a difficult problem. She really needs to lose weight. Obviously, this is not the only solution to her problems, but should help. She says she knows this." (Tr. at 232). Rather than instructing Claimant to limit her activities, however, Dr. Weinsweig referred Claimant to a pain clinic to help her manage her daily routine. Likewise, Dr. Brownfield repeatedly noted that Claimant was morbidly obese, but also documented that she ran a day

care business out of her home. (Tr. at 239, 242, 252, 315, 334). Despite having knowledge of Claimant's business, which likely placed substantial physical and mental demands on her, Dr. Brownfield made no recommendation that Claimant limit her activities. Claimant's gynecologist, Dr. Haddox, also diagnosed Claimant's obesity. (Tr. at 281). However, like Dr. Weinsweig and Dr. Brownfield, Dr. Haddox did not recommend or require any limitations on Claimant performing basic work activities.

A diagnosis of obesity, even morbid obesity, is not determinative of the severity of this impairment. Social Security Ruling 02-1p makes it clear that no specific Body Mass Index ("BMI") equates with a finding of "severe" or "non-severe" impairment. Instead, a determination of severity is made based upon "an individualized assessment of the impact of obesity on an individual's functioning." SSR 02-1p. Here, the record substantially supports the ALJ's conclusion that Claimant's obesity did not significantly affect her functioning.

Moreover, Claimant's argument that her diabetes and obesity constituted severe impairments that significantly limited her ability to engage in basic work activities is substantially weakened by the fact that she worked throughout much of the relevant time period. Basic work activities are "the abilities and aptitudes necessary to do most jobs[,]" including: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). It is reasonable to

conclude that running a day care business would require the use of all of these basic abilities. In light of the objective medical findings and the description of Claimant's daily activities during the insured period, the Court finds that the ALJ's decision that Claimant's diabetes and obesity did not significantly limit her ability to perform basic work functions was correct and supported by substantial evidence.

**B.**     **ALJ's RFC Assessment**

Claimant next argues that the ALJ failed to fully account for Claimant's functional limitations in the RFC assessment. At step four of the sequential evaluation of a claimant's disability claim, the ALJ must make a RFC assessment. Residual functional capacity is the most activity the claimant can perform in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). In completing an RFC assessment, the ALJ will consider all of the relevant evidence, including the medical records, medical source opinions, and the claimant's subjective allegations and description of her own limitations. *Id.* at § 404.1545(a)(3). With respect to a claimant's physical abilities, then ALJ will assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. *Id.* at § 404.1545(b). "A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching), may reduce [the claimant's] ability to do past work and other work." *Id.* Ultimately, the ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining the claimant's residual functional capacity. Instead, a claimant's residual functional

capacity is one of the issues exclusively reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e).

An examination of the ALJ's RFC assessment confirms that he took into account the exertional and nonexertional limitations that resulted from Claimant's medically determinable physical and mental impairments. In reaching his decision, the ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence. (Tr. at 13–15). The ALJ discussed Claimant's testimony at length. (Tr. at 13–14). Claimant testified that she unable to work in 2003 due to her degenerative joint disease, indicating that her ability to stand was limited to two to three hours per day in an eight hour day and only one hour continuously. Claimant also complained of severe pain related to the joint disease. The ALJ considered these statements and observed that despite Claimant's alleged impairment, she did not have physical therapy during the relevant period, perform home exercises, nor wear any assistive device, such as a brace. Further, the ALJ noted that Claimant acknowledged control of her pain symptoms with medications. The ALJ then evaluated the objective medical evidence relevant to Claimant's physical and mental impairments and compared it with Claimant's testimony. (Tr. at 14). Based on the objective medical findings contained in the record, the ALJ determined that Claimant first complained of lower back pain in 1999. The ALJ observed that a physical examination of Claimant conducted in October 2000 by Dr. Weinsweig revealed that Claimant had strong motor strength throughout her upper and lower extremities; intact sensation; equal reflexes; and a normal gait. In addition, Dr. Weinsweig reviewed the MRIs of Claimant's cervical and lumbar spine and described them as unremarkable, revealing only mild

degenerative changes. The ALJ discussed Dr. Brownfield's examination of Claimant for lower back pain in 2002 and observed that Dr. Brownfield detected no tenderness in Claimant's back. (*Id.*).

Claimant also testified that she suffered from panic attacks on a weekly basis in 2003 due to stress and anxiety and these affected her ability to work. The ALJ noted that Claimant reported suffering from depression during 2003 but that she received no treatment from a mental health professional after the disability onset date. Finally, the ALJ reviewed the medical records for treatment of Claimant's depression and anxiety, noting that all of the records pre-dated May 1999. Records substantiating ongoing, acute symptoms of psychological distress were not apparent during the relevant time period. In fact, the ALJ noted that in 1999 Claimant reported that she had stopped taking medication for depression and in February 2002 she denied having any psychological symptoms that required care by a psychiatrist. (Tr. at 14).

The ALJ additionally considered the reports of the state agency medical consultants. (Tr. at 15). First, the ALJ noted that the record did not contain a RFC or PRT from a treating source. Second, the ALJ explained that he gave little weight to the assessments of the state agency psychological consultants because they did not examine Claimant and made no findings due to lack of evidence submitted. Third, the ALJ addressed the state agency medical consultant's RFC, which found Claimant was capable of medium work. The ALJ "gave little weight to the assessment of the state agency physician because [the state agency physician] did not examine the claimant." After fully analyzing the treatment records and reports of Claimant's activities, the ALJ made RFC findings based upon the evidence as a whole, stating:

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could occasionally climb, balance, stoop, kneel, crouch, or crawl; could not work in cold temperature extremes or around excessive dust, fumes, or chemicals; could not reach overhead; could stand 2-3 hours total per day at 1 hour intervals, sitting was unaffected; and was limited to more simple, routine work without significant public contact.

(Tr. at 13, Finding No. 5). This RFC finding is supported by substantial evidence. No treating physician, including Claimant's chiropractor, ever found that Claimant was incapable of engaging in substantial gainful activity during the relevant time period. Dr. Brownfield was aware of Claimant's day care business and did not recommend any restrictions on her activites. (Tr. at 239, 242, 252, 315, 334). The Social Security regulations clearly state that work performed by a claimant during an alleged period of disability may be considered as evidence that a claimant is able to engage in substantial gainful activity. *Id.* at § 404.1571. Moreover, even if the work a claimant performed does not amount to substantial gainful activity, it may still provide evidence of what a claimant is capable of doing. *Id.* In this case, the ALJ undoubtedly considered the various pieces of evidence in the record and performed a thorough analysis of the weight to assign to each piece. For example, the ALJ gave Dr. Egnor's RFC finding little weight, discounting his conclusions that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in her ability to push or pull. (Tr. at 503). Notwithstanding the contradictory evidence, the ALJ gave full credit to Claimant's testimony at the administrative hearing that she was only able to stand for about two to three hours a day in an eight hour day for about one hour at a time, incorporating her statements in the RFC assessment. Ultimately, the ALJ's RFC assessment was narrowly tailored to be compatible with the evidence of Claimant's

objective physical and mental impairments and her own subjective testimony. At the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to take into account Claimant's mental and physical impairments in combination. (Tr. at 39). He asked the expert to assume that Claimant had the exertional limitations identified in his RFC assessment, as well as additional postural and environmental limitations. Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform certain sedentary jobs that existed in significant numbers in the economy. (Tr. at 39–42). The Court, therefore, finds that the ALJ properly considered Claimant's mental and physical impairments in making the RFC assessment.

### C.    **ALJ's Consideration of Records Prepared by an Other Source**

Claimant also contends that the ALJ failed to address Claimant's extensive chiropractic treatment with Dr. Fredrick from 1997-2007. Citing SSR-06-03p, Claimant states that the ALJ was required to consider Dr. Fredrick's opinion in determining whether Claimant was disabled. Absent express consideration of Dr. Fredrick's treatment records, Claim contends that the decision of the ALJ was not supported by substantial evidence.

A review of the ALJ's written decision verifies that he did not explicitly rely upon or refer to the treatment records of Dr. Frederick in making his findings. 20 C.F.R. § 404.1527 details the process by which the SSA will consider opinion evidence in determining whether a claimant is disabled. "Regardless of its source, we [the SSA] will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(d); *see also* 20 C.F.R. § 404.1520(a)(3) ("We [the SSA] will consider all

evidence in your case record when we make a determination or decision whether you are disabled.").  In addition to the opinions of accepted medical sources, the SSA may also use evidence from "other sources," including nurse-practitioners, physician's assistants, chiropractors, audiologists, naturopaths, and therapists. 20 C.F.R. § 404.1513(d).  "Evidence includes, but is not limited to, opinion evidence from 'acceptable medical sources,' medical sources who are not 'acceptable medical sources,' and 'non-medical sources' who have seen the individual in their professional capacity." SSR 06-03p. As Claimant points out, Social Security Ruling 06-03p provides:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

SSR 06-03p.

Therefore, to the extent that the ALJ failed to consider Dr. Frederick's opinions and failed to explain the weight he gave to those opinions, the ALJ failed to comply with the mandate of Social Security regulations and policy interpretations. The Supreme Court of the United States has recognized as a fundamental principle

of administrative law that agencies are obligated to follow their own regulations. *American Farm Lines v. Black Ball Freight Service, et al.,* 397 U.S. 532 (1970). However, courts have applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D. Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen,* 864 F.2d 333, 335 (5th Cir. 1988). The Fourth Circuit has similarly applied the harmless error analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished). Accordingly, the ALJ's failure to consider and weigh Dr. Fredrick's treatment records constituted legal error, but that error does warrant remand unless Claimant was prejudiced by the procedural lapse. Having reviewed the records supplied by Dr. Frederick, the Court finds that they are generally consistent with the records of the other treating sources and do not provide significant contradictory or conflicting opinions. Consequently, the ALJ's oversight of Dr. Fredrick's treatment records in the written decision did not result in harm to

Claimant and does not necessitate a remand.

Between May 2, 1999 and December 31, 2003, Claimant received chiropractic treatment from Dr. Fredrick on twenty-eight separate occasions. (Tr. at 415-24). Throughout this treatment course, Claimant complained of persistent lower back pain and intermittent shoulder, neck, hip, leg, and foot pain. However, Dr. Fredrick's treatment notes contain only cursory descriptions of Claimant's subjective complaints and statements; short summaries of the therapy rendered; and conclusory assessments. Dr. Fredrick periodically completed more detailed radiographic reports, which evaluated Claimant's lumbar, cervical, and thoracic spine. On June 3, 2002, Dr. Fredrick completed a radiographic report and concluded that Claimant suffered from simple scoliosis of the cervical spine and subluxations of the C7, T5, T10, and L5 discs. (Tr. at 442). On August 11, 2003, Dr. Fredrick completed another radiographic report in which he opined that Claimant had hyporlordosis and scoliosis of the cervical spine and misalignment and hyporlordosis of the lumbar spine. (Tr. at 441). Dr. Fredrick did not offer opinions regarding Claimant's functional limitations and never documented that Claimant's back, shoulder, hip, leg, or foot pain impeded her abilities to work or complete activities of daily living. Nor did Dr. Fredrick make any findings of back or foot problems that would satisfy the criteria of a listed impairment.  He never referred Claimant to a neurosurgeon or orthopedist for surgical care, nor did he recommend injections for pain management or physical therapy. In June 2002, Dr. Frederick performed a whole body examination and noted that Claimant's general appearance was robust, her ambulation was normal, and she had no history of spinal surgery. (Tr. at 448). In August 2003, he repeated the examination and found Claimant's

general appearance to be good and her ambulation to be normal. (Tr. at 443). Dr. Frederick's records, which span from 1997-2007, provide a longitudinal history of Claimant's musculoskeletal symptoms that is entirely consistent with the records of Dr. Weinsweig, Claimant's neurosurgeon, and Dr. Bolano, Claimant's orthopedic surgeon. Ultimately, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989); *see also Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, *1 (4th Cir. 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, *1 (4th Cir. 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, *1 (4th Cir. 1996). In light of the consistency of Dr. Frederick's records with the records explicitly relied upon by the ALJ, the Court has no reason to believe that a more in-depth consideration of Dr. Frederick's records would reasonably have lead to a different result. Therefore, a remand to consider Dr. Fredrick's treatment records would be a fruitless exercise that needlessly favors form over substance and simply is not justified by the evidence of record.

### D.    ALJ's Credibility Finding

Finally, Claimant contends that the ALJ's credibility finding was improper because the ALJ failed to consider Dr. Fredrick's treatment records. Emphasizing that Dr. Fredrick's records corroborated her testimony at the administrative hearing, Claimant argues that the ALJ's credibility finding cannot be supported by substantial evidence without a consideration of those treatment records. Again, Claimant is correct in observing that the ALJ failed to expressly rely upon or refer to

Dr. Fredrick's treatment records in discussing his credibility findings. However, the Court's prior harmless error analysis is equally applicable to this allegation.

In evaluating a claimant's credibility, an ALJ will consider all of a claimant's symptoms, including pain, and the extent to which a claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529. SSR 96-7p sets forth the factors that an ALJ should consider in assessing a claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In determining a claimant's credibility, an ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[4] any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);[5] and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[6] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). An ALJ's credibility finding:

> must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the

---

[4] *See* 20 C.F.R. § 404.1529(c)(1).

[5] *See* 20 C.F.R. § 404.1529(c)(2).

[6] *See* 20 C.F.R. § 404.1529(c)(3).

> regulations for evaluating symptoms. The determination or decision
> must contain specific reasons for the finding on credibility, supported
> by the evidence in the case record, and must be sufficiently specific to
> make clear to the individual and to any subsequent reviewers the
> weight the adjudicator gave to the individual's statements and the
> reasons for that weight. This documentation is necessary in order to
> give the individual a full and fair review of his or her claim, and in
> order to ensure a well-reasoned determination or decision.

SSR. 96-7p.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Ultimately, credibility determinations as to a claimant's testimony regarding her limitations are for the ALJ to make. *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989–90 (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

Assuming *arguendo* that the ALJ failed to consider Dr. Fredrick's treatment records—rather than simply failing to mention them in the analysis—he was guilty of a procedural lapse. However, this lapse amounts to nothing more than harmless error. Inasmuch as Dr. Fredrick's records support, rather than undermine, the ALJ's conclusion that Claimant was only partially credible, Claimant was not prejudiced

by the ALJ's failure to mention them. At the administrative hearing, Claimant testified that she was unable to work in 2003 due to degenerative joint disease. (Tr. at 13). Instead, Dr. Fredrick's records provide no support for this conclusion. The treatment records indicate that Claimant experienced pain and decreased range of motion in her lumbar and cervical spine due to *mild* degenerative changes and spinal misalignment. Significantly, Dr. Fredrick's treatment records include no notation indicating that Claimant was unable to perform basic work functions or that she was unable to engage in substantial gainful activity. In this respect, Dr. Fredrick's treatment records are consistent with those of the numerous physicians that examined Claimant, none of whom found her to be unable to engage in basic work functions or substantial gainful activity. Consequently, as Dr. Fredrick's records support a conclusion contradictory to Claimant's assertion that she was unable to work in 2003, consideration of Dr. Fredrick's treatment records would not have reasonably altered the result of the ALJ's credibility finding. As stated *supra,* under the harmless error framework, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989); *see also Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, *1 (4th Cir. 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, *1 (4th Cir. 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, *1 (4th Cir. 1996).

　　Moreover, the ALJ's credibility finding is supported by substantial evidence. The ALJ properly considered Claimant's testimony and reviewed the objective medical evidence, including treatment records and the reports of state agency

medical consultants, in determining Claimant's credibility. (Tr. at 13–15). Claimant described experiencing severe back pain that radiated down into her hips and a sharp pain in her feet that prevented her from standing for more than an hour at time. (Tr. at 13). Based on her degenerative joint disease, Claimant testified that she was unable to work during 2003. (*Id.*). Claimant further stated that her doctor recommended she have surgery on her feet but that she did not have the surgery because of fear that her feet would not heal due to diabetes. (*Id.*). Claimant also described the effects of her anxiety and depression on her ability to function in her daily life. (Tr. at 14). However, in contrast to Claimant's testimony, the medical records do not describe symptoms of such severity that Claimant was precluded from engaging in basic work activities. Claimant began treatment for back pain in 1998. MRIs of Claimant's lumbar and cervical spine were reviewed by numerous doctors, including Dr. Fredrick, who all found an absence of significant abnormalities and no indications of neurological problems. During the relevant period, no doctor ever recommended spinal surgery, physical therapy, rehabilitation, home exercises, or assistive devices for Claimant's back pain. Furthermore, Claimant confirmed that her prescribed medications controlled her pain symptoms. At least one state agency consultant found that Claimant was capable of medium level work with postural and environmental limitations. Similarly, with respect to Claimant's depression and anxiety, there were simply no records of treatment by mental health professionals during the relevant time period. Consequently, state agency consultants were unable to complete PRTs due to lack of evidence. In short, no evidence, including Dr. Fredrick's treatment records, corroborates Claimant's testimony that she unable to work during the relevant time

period. To the contrary, the vast majority of the evidence suggests that Claimant was capable of performing basic work functions and was not disabled under the Social Security Act. Having thoroughly reviewed the record, it is clear to this Court that the ALJ's credibility finding is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**:  December 21, 2011.

Cheryl A.  Eifert
United States Magistrate Judge

41